CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 1 0 2014

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Roanoke Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.,* | ) |
| UXB INTERNATIONAL, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 7:14CV00339 |
| | ) |
| 77 CONSTRUCTION COMPANY, | ) |
| | ) |
| 77 CONSTRUCTION, CONTRACTING | ) |
| & TRADING CO., | ) |
| | ) |
| 77 CONSTRUCTION, CONTRACTING | ) |
| & TRADING CO. (Afghanistan), | ) |
| | ) |
| 77 CONSTRUCTION, CONTRACTING | ) |
| & TRADING CO. (Iraq), | ) |
| | ) |
| and | ) |
| | ) |
| SULEYMAN CILIV, individually, | ) |
| | ) |
| Defendants. | ) |

# COMPLAINT

## INTRODUCTION

UXB International, Inc. ("UXB") entered into a series of subcontracts with

Defendant 77 Construction Company ("77 Construction"). At the conclusion of the

performance of these contracts, 77 Construction was either unable or unwilling to provide

required documentation of its actual costs incurred in the performance of the work. As a

result of these issues, UXB withheld certain payments from 77 Construction, pending

receipt of this information and certain other outstanding deliverables, and the resolution

of related billing issues. Rather than provide the cost information and accounting

support, 77 Construction brought suit against UXB seeking payment of the disputed invoices. 77 Construction first brought suit in the name of its principal shareholder, Suleyman Ciliv ("Ciliv"). After this action was dismissed, suit was refiled in the name of 77 Construction. That suit is currently pending in the United States District Court for the Western District of Virginia. In the course of the litigation between UXB and 77 Construction, and during a meeting between Ciliv and UXB, UXB discovered that the invoices and demands for payment 77 Construction submitted to UXB included inflated costs and overhead amounts. UXB also discovered that 77 Construction submitted these invoices and demands for payment knowing that the costs and overheard reflected in the invoices were fraudulent, were incurred in the performance of work for the United States Government (the "Government"), and would result in false and fraudulent billings.

As a result of 77 Construction's submission of false claims to UXB, UXB became an unknowing intermediary when it submitted these false claims to the Government. Upon discovering 77 Construction's fraudulent claims, UXB sought to rectify the situation by, *inter alia*: issuing a notice of disallowance regarding each of the inflated and false charges; contacting the United States Army Corps of Engineers and informing them of its concerns; contacting the United States Attorney for the Western District of Virginia and reporting 77 Construction's fraudulent scheme; and bringing the instant action on behalf of the Government to recover the monies wrongfully paid to 77 Construction by the Government.

## PARTIES

1.      *Qui Tam* Plaintiff UXB is a Virginia corporation with its principal place of business located in Montgomery County, Virginia. (Dugger Dec.[1] 5) At all times relevant hereto, UXB was engaged in the business of disposing of military munitions and explosives including land mines, and providing services related thereto. (*Id.*)

2.      Defendant 77 Construction is a foreign limited liability company formed under the laws of Afghanistan, with its principal place of business located in Kabul, Afghanistan. It provides support for reconstruction activities under federal government contracts and subcontracts in Iraq and Afghanistan. Upon information and belief, it is a subsidiary of or related entity to Defendant 77 Construction, Contracting and Trading Co. (77 Construction Turkey), a Turkish corporation of which Ciliv is the majority shareholder.

3.      Upon information and belief, 77 Construction Turkey and/or Ciliv, own and operate two related companies or divisions, Defendant 77 Construction, Contracting and Trading Co. operating in Afghanistan (hereinafter 77 Construction Afghanistan) and Defendant 77 Construction, Contracting and Trading Co. operating in Iraq (hereinafter 77 Construction Iraq). Ciliv has also represented in the Litigation that some work in Afghanistan for the United States Government was performed by him as a sole proprietor, and to the extent that this statement is accurate, he is also a proper named defendant herein.

4.      Ermin Ovali ("Orvali") is a United States citizen and employee of 77 Construction, and possibly another defendant in this action.

---

[1] A true and correct copy of Richmond H. Dugger, IV's Declaration is attached hereto as **Exhibit 1**.

5.     Muhittin Cimoglu was 77 Construction's construction project manager who oversaw all of 77 Construction's operations and projects at Bagram Air Base in Afghanistan ("Bagram"). (Deposition of Suleyman Ciliv ("Ciliv Dep.") at 9:2-6).[2]

6.     Suleyman Ciliv ("Ciliv") is the majority owner of 77 Construction and the other Defendant entities. (Ciliv Dep. 7:15-8:3).

7.     Each of the Defendants entered into contracts as either a prime or subcontractor of the United States Government, and submitted invoices related to such work knowing, and with the intention, that these invoices and requests for payment would be submitted to the United States Government for payment.

## JURISDICTION AND VENUE

8.     This action arises under 31 U.S.C. § 3729, *et seq.* Therefore, this is a case or controversy arising under the laws of the United States and there is subject matter jurisdiction under 28 U.S.C. § 1331.

9.     This action may be brought in this judicial district pursuant to 31 U.S.C. § 3732(a) because, *inter alia,* the Defendant 77 Construction and Ciliv transacted business in this judicial district, and took other actions submitting themselves and the remaining Defendants to the jurisdiction of this Court.

## FACTS

10.     In 2010, 77 Construction had $106,912,847 in direct sales and incurred $97,903,376 in direct costs for labor and materials related to those sales in Afghanistan.

---

[2] A true and correct copy of the relevant portions of Suleyman Ciliv's Deposition Transcript is attached hereto as **Exhibit 2**.

(*See* 77 Construction Company Financial Statements for the Year Ended December 31, 2010[3] ("Audited Financials")).

11.     Also in 2010, 77 Construction incurred $2,546,922 in "Operational Expenses" in relation to its direct costs. (*Id.*, Ciliv Dep. 21:18-22:1) Operational Expenses included personnel, security, lodging, communication and other expenses. (*Id*, pg. 12.) Thus, according to 77 Construction's Audited Financials, 77 Construction's operational expenses as a percentage of its direct expenses were approximately 2.6% in 2010.

12.     As a result, 77 Construction reported a net profit for 2010 of $6,301,820. (Ex. 3, pg. 5.)

### Prime Contract and Delivery Order

13.     UXB was awarded a contract by the United States Army Corps of Engineers dated June 9, 2004 with contract number W912DY-04-D-0019 (the "Prime Contract").[4] (Dugger Dep.[5] 13:6-11, 15:2-23 Nov. 26, 2013)

14.     UXB was the Prime Contractor under the Contract. (Dugger Dec. 6)

15.     Pursuant to the Prime Contract, a delivery order[6] was issued with order number W912DY-04-D-00190007 (the "Delivery Order"),[7] which authorized funds for mine clearance and other related projects at Bagram. (Dugger Dep. 15:2-23.)

16.     The Prime Contract contains numerous provisions related to billing and invoicing.  (Ex. 4, pgs. 49-50.)

---

[3] A true and correct copy of 77 Construction's Audited Financials is attached hereto as **Exhibit 3**.

[4] A true and correct copy of the Prime Contract is attached hereto as **Exhibit 4**.

[5] A true and correct copy of the relevant portions of Richmond H. Dugger, IV's deposition transcript is attached hereto as **Exhibit 5**.

[6] Although not identical, a delivery order is commonly referred to as a task order.

[7] A true and correct copy of the Delivery Order without amendments is attached hereto as **Exhibit 6**.

17.     The Prime Contract specifically provides that "[t]he contractor shall provide receipts for purchases/rental of materials, time sheets of individual employees, and travel vouchers for employee as called for under clause 52.242-4611, Travel Expenses for all T&M Task Orders. Each Portion of the above shall have a recap sheet identifying each charge." (*Id.*)

18.     Further, the Prime Contract incorporates a number of provisions of the Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 1.000, *et seq.*, by reference (Ex. 4, pgs. 64–67.)

19.     These FAR provisions include, but are not limited to:

48 CFR 52.215-2:  Audit and Records -- Negotiation

48 CFR 52.215-10:  Price Reduction for Defective Certified Cost or Pricing Data

48 CFR 52.214:12:  Subcontractor Certified Cost or Pricing Data

48 CFR 52.242-1:  Notice of Intent to Disallow Costs

48 CFR 52.242-3:  Penalties for Unallowable Costs

48 CFR 52.242-4:  Certification of Final Indirect Costs

### Purchase Order Subcontracts And Cost Estimates

20.     Pursuant to the Prime Contract and Delivery Order, UXB and 77 Construction entered into a total of eight purchase orders, *i.e.* subcontracts to the Prime Contract (collectively the "Purchase Orders" or the "Subcontracts"), whereby 77 Construction was to provide construction and related services in support of UXB's de-mining operations at Bagram. (Ciliv Dep. 25:13-36:15; Cimoglu Dep.[8] 75:5-12, Nov. 25, 2013, Dugger Dec. 7)

---

[8] A true and correct copy of the relevant portions of Muhittin Cimoglu's Deposition Transcript is attached hereto as **Exhibit 7**.

21.     On or about April 22, 2010, UXB entered into Purchase Order Number 10-0026 ("PO-26"[9]) with 77 Construction in the amount of $18,750 for the delivery of approximately 30 15' tall T-walls.[10]  (See Ex. 8; Cimoglu Dep. 19:10-18)

22.     PO-26 contains what is commonly known as a "flow-down" provision whereby 77 Construction, as the subcontractor, assumed toward UXB the same duties and responsibilities that UXB, as the Prime Contractor, assumed toward the U.S. Government.[11]  (Ex. 8, pg. 2)  Specifically, the flow-down provision states:

> INCORPORATION OF THE PRIME CONTRACT. Subcontractor [77 Construction] assumes toward Contractor all of the obligations and responsibilities that Contractor assumes toward its Client in the contract between the Contractor and its Client ("Prime Contract") as it relates to the Services. The Prime Contract is incorporated herein by reference and the applicable portions thereof shall be made available to the Subcontractor upon request.

23.     PO-26 contains a provision for inspections of 77 Construction's work under the purchase order.  (Ex. 8, pg. 2)  Specifically, PO-26's Inspection provision provided:

> INSPECTIONS.  Contractor or its client may inspect and otherwise evaluate the Services at any reasonable time and place but such review or approval is for Contractor's sole benefit and shall not relieve Subcontractor from its representations and obligations set forth in this Agreement.  If any of the Services fail to meet the requirements hereof, Contractor shall notify Subcontractor of such fact, stating the nature of the deficiency.  Subcontractor shall promptly correct any such deficiencies at no additional cost to Contractor.  **Subcontractor shall maintain complete and accurate working files, including but not limited to calculations, interpretations, assumptions, logs, drawings, equipment calibrations and other records pertaining to the Services. Subcontractor shall provide Contractor with unrestricted access to such items and dispose of them only as directed by Contractor.**  Subcontractor sha+A6ll [sic] strictly comply with all protocols,

---

[9] A true and correct copy of PO-26 is attached hereto as **Exhibit 8**.
[10] A T-wall is a reinforced concrete barrier used to protect military and other personnel from enemy attack such as snipers and suicide bombers. (Cimoglu Dep. 19:16-20:4).
[11] Identical "flow-down" provisions are contained in all but two of the written contracts at issue in this case.

7

procedures, specifications and other guidelines or requirements for performing the services.

(emphasis added).

24.     PO-26 contains specific provisions dealing with billings between 77 Construction and UXB. (Ex. 8, pg. 2). Specifically, PO-26's Billing provision provides:

> BILLINGS. Subcontractor warrants that to its best knowledge and belief, the billings presented by Subcontractor are a correct, complete and accurate statement of the Services provided by Subcontractor, that Subcontractor is properly entitled to payment, and that all amounts requested are for appropriate purposes in strict accordance with the terms of this Agreement. All materials provided by Contractor shall be accounted for and materials not accounted for will be charged to and paid for by the Subcontractor. Subcontractor shall only charge for materials in the quantities actually used in the performance of the services. Each invoice shall contain all invoice data required in the Prime Contract as it relates to the services.

25.     On or about April 27, 2010, UXB entered into Purchase Order Number 10-0028 ("PO-28"[12]) with 77 Construction in the amount of $1,194,034 for ground preparation and erecting services of UXB's base camp for its operations at Bagram. (Cimoglu Dep. 31:10-32:2) Hereinafter, the camp identified in PO-28 shall be referred to as the "First Camp."

26.     Prior to entering into PO-28, 77 Construction provided to UXB a "Construction Cost Estimate Analysis" ("PO-28 Cost Estimate").[13] (Cimoglu Dep. 92:8-24) The PO-28 Cost Estimate identifies various costs for labor and materials and includes a 15% overhead charge and a 10% charge for profit. (Ex. 10)

27.     PO-28 contains numerous provisions; however, PO-28 contains differing and additional contractual provisions to those of PO-26. (*See* Ex. 9)

---

[12] A true and correct copy of PO-28 is attached hereto as **Exhibit 9**.

[13] A true and correct copy of the "Construction Cost Estimate Analysis" for PO-28 is attached hereto as **Exhibit 10**.

28.     PO-28 contains a provision dealing with changes to the scope of work. (Ex. 9, pg. 2) Specifically, PO-28 contains a "Changes" provision which provides, in relevant part:

> CHANGES. Work beyond the scope of services or redoing any part of the project through no fault of Client [77 Construction], shall constitute extra work and shall be paid for on a time-and-materials bases in addition to any other payment provided for in this Agreement. . . . If, during the course of performance of this Agreement, conditions or circumstances are discovered which were not contemplated by Client at the commencement of this Agreement, Client shall notify UXB in writing of the newly discovered conditions or circumstances and the impact on the Agreement. All previous proposals, offers, and other communications relative to the provisions of these services are hereby superseded.

29.     Because UXB had hundreds of de-miners coming into Afghanistan to work who needed a place to live, time was of the essence to get the First Camp completed. (Cimoglu Dep. 33:11-19; 36:23-24) 77 Construction began work on the First Camp almost immediately. (Cimoglu Dep. 32:16-21) However, 77 Construction was only able to work on the First Camp for approximately one week before the Government issued a "stop-work order"[14] which directed that all work on the First Camp cease immediately. (Cimoglu Dep. 35:1-39:13, Dugger Dec. 8) At that time, the First Camp was not completed. (*Id.*)

30.     Because UXB was still in urgent need of a base camp from which to conduct its de-mining operations at Bagram, on May 19, 2013, UXB and 77 Construction entered into Purchase Order 10-0052[15] in the amount of $2,781,142 for ground preparation and erecting services of a second base camp for UXB's operations at Bagram.

---

[14] A true and correct copy of the Stop Work Order and related communications is attached hereto as **Exhibit 11**.

[15] A true and correct copy of PO-52 is attached hereto as **Exhibit 12**.

(Ex. 12, Cimoglu Dep. 59:9-23) Hereinafter, the camp identified in PO-52 shall be referred to as the "Second Camp."

31. While the "Scope of Services" and "Compensation" provisions of PO-28 and PO-52 vary, the "Terms and Conditions" provisions of PO-28 and PO-52 are identical with each containing the same "CHANGES," "PAYMENT," "INDEMNITY," "LIMITATION OF LIABILITY," and "FINAL PAYMENT/RELEASE" provisions. (*See* Exs. 9 and 12)

32. PO-52 also superseded any prior agreement between UXB and 77 Construction. (Ex. 12, pg. 1.) Specifically, PO-52 provides that:

> EXTENT OF AGREEMENT. This Agreement, including attachment incorporated herein by reference, represents the entire agreement between UXB and Client and supersedes all prior, negotiations, representations, or agreements, either written or oral. This Agreement may be altered only by written instrument signed by authorized representatives of both Client and UXB.

33. Just as with PO-28, prior to entering into PO-52, 77 Construction provided to UXB a "Construction Cost Estimate Analysis" ("PO-52 Cost Estimate").[16] (Cimoglu Dep. 116:15-21). The PO-52 Cost Estimate identifies various costs for labor and materials and includes a 15% overhead charge and a 10% charge for profit. (Ex. 13)

34. On or about May 2, 2010, UXB and 77 Construction entered into Purchase Order 10-0033 ("PO-33")[17] in the amount of $110,000 for the monthly rental of two 50-ton cranes at Bagram. (Cimoglu Dep. 54:17-22)

---

[16] A true and correct copy of the "Construction Cost Estimate Analysis" for PO-52 is attached hereto as **Exhibit 13**.
[17] A true and correct copy of PO-33 is attached hereto as **Exhibit 14**.

35.     PO-33 and PO-26 contain identical "terms and conditions" provisions including identical provisions related to "Incorporation of the Prime Contract," "Inspections," "Billings," and "Final Payment/Release." (See Exs. 8 and 14)

36.     On or about June 23, 2010, UXB and 77 Construction entered into Purchase Order 10-0073 ("PO-73")[18] in the amount of $300,000 for the installation of perimeter fencing for the Russian Motor Pool area at Bagram. (Ex. 15, Cimoglu Dep. 66:8-20)

37.     PO-26 and PO-73 contain identical "terms and conditions" provisions including identical provisions related to "Incorporation of the Prime Contract," "Inspections," and "Billings." (See Exs. 8 and 15.)

38.     On or about July 2, 2010, UXB and 77 Construction entered into Purchase Order 10-0078 ("PO-78")[19] in the amount of $235,308 for the construction of a dog kennel at the Second Camp. (Ex. 16, Cimoglu Dep. 69:9-20.)

39.     PO-26 and P0-78 contain identical "terms and conditions" provisions including identical provisions related to "Incorporation of the Prime Contract," "Inspections," and "Billings." (See Exs. 8 and 16)

40.     On or about July 29, 2010, UXB and 77 Construction entered into Purchase Order 10-0091 ("PO-91")[20] in the amount of $61,785 for the relocation of T-wall barriers. (Ex. 17, Cimoglu Dep. 72:7-13)

41.     PO-26 and PO-91 contain identical "terms and conditions" provisions including identical provisions related to "Incorporation of the Prime Contract," "Inspections," and "Billings." (See Exs. 8 and 17)

---

[18] A true and correct copy of PO-73 is attached hereto as **Exhibit 15**.
[19] A true and correct copy of PO-78 is attached hereto as **Exhibit 16**.
[20] A true and correct copy of PO-91 is attached hereto as **Exhibit 17**.

42.     On or about July 29, 2010, UXB and 77 Construction entered into Purchase Order 10-0092 ("PO-92")[21] in the amount of $171,075 for the construction of additional perimeter fence line around the Russian Motor Pool Area.  (Ex. 18, Cimoglu Dep. 73:7-16).

43.     PO-26 and PO-92 contain identical "terms and conditions" provisions including identical provisions related to "Incorporation of the Prime Contract," "Inspections," and "Billings." (See Exs. 8 and 18) Thus, PO-26, PO-33, PO-73, PO-78, PO-91, and PO-92 contain identical relevant provisions.

## Sole Source

44.     A sole source contract is defined as a contract where there is not competitive bidding, and only one provider for the goods or services is considered and/or available to perform the work.  (*See* 48 CFR 6.302-1 and 2)

45.     Six of the eight Purchase Orders were issued on a sole source basis. Specifically, PO-26, P0-28, PO-52, PO-73, PO-78 and PO-92 are sole source contracts. (Dugger Dec. 9) These sole source contracts were necessary because 77 Construction was the only reasonably available source for the services to be provided and because of the unusual and compelling urgency of UXB's need to have a base camp. (Dugger Dec. 10, Cimoglu Dep. 32:19-21)

46.     Because these six purchase orders were sole source, they were not subject to full and open competition.  Therefore, there was no bidding process. (Dugger Dec. 9)

## Invoices and Payments

47.     77 Construction issued a total of 26 invoices to UXB for services allegedly performed on behalf of UXB at Bagram in 2010 (collectively the "Invoices").  (Dugger

---

[21] A true and correct copy of PO-92 is attached hereto as **Exhibit 18**.

Dec. 11) The Invoices, as well as any related payments by UXB to 77 Construction, are described in more detail below.

48.     On April 27, 2010, 77 Construction issued Invoice 146[22] to UXB in the amount of $18,750. (Ex. 19) Invoice 146 relates to work allegedly performed by 77 Construction pursuant to PO-26. Invoice 146 constitutes the full amount of PO-26 and was paid in full by UXB (Ex. 19, Cimoglu Dep. 79:4-15).

49.     On or about May 4, 2010, 77 Construction issued Invoice 152[23] to UXB in the amount of $387,568. (Ex. 20) Invoice 152 relates to work allegedly performed by 77 Construction on the First Camp pursuant to PO-28 prior to the issuance of the Stop-Work Order. (Ex. 20, Cimoglu Dep. 80:8-81:14) UXB paid Invoice 152 in full. (Cimoglu Dep. 80:8-81:14)

50.     On or about May 16, 2010, 77 Construction issued Invoice 164[24] in the amount of $33,056. (Ex. 21) 77 Construction identified PO-28 as the purchase order pursuant to which the work identified in Invoice 164 was performed. (Ex. 21, Cimoglu Dep. 98:22-101:11.) Invoice 164 covers work allegedly performed by 77 Construction at the First Camp during the time period between the Stop-Work Order and the execution of PO-52. (*Id.*) UXB paid Invoice 164 in full. (Cimoglu Dep. 104:9-11)

51.     On or about May 26, 2010, 77 Construction issued Invoice 169[25] for work allegedly performed under PO–52. (Ex. 22) Invoice 169 was initially issued in the full amount of PO-52, $2,781,162, but because of changes in the scope of work, 77 Construction reissued Invoice 169 in the amount of $2,767,654.24. (Ex. 22, Cimoglu

---

[22] A true and correct copy of Invoice 146 is attached hereto as **Exhibit 19**.
[23] A true and correct copy of Invoice 152 is attached hereto as **Exhibit 20**.
[24] A true and correct copy of Invoice 164 is attached hereto as **Exhibit 21**.
[25] A true and correct copy of Invoice 169 is attached hereto as **Exhibit 22**.

Dep. 105:10-107:12) UXB paid 90% of Invoice 169 up-front, $2,534,684, and retained the final 10% pending satisfactory completion of the Second Camp. (Cimoglu Dep. 127:17-22) Invoice 169 constitutes the full amount of PO-52. (Cimoglu Dep. 108:4-7)

52.    On June 4, 2010, 77 Construction issued Invoice 183[26] to UXB in the amount of $110,000. (Ex. 23, Cimoglu Dep. 129:16-20.) Invoice 183 relates to the rental of two cranes by 77 Construction pursuant to PO-33. (Ex. 23) Invoice 183 constitutes the full amount of PO-33 and was paid in full by UXB (Cimoglu Dep. 130:23-131:8)

53.    On or about June 8, 2010, 77 Construction issued Invoice 186[27] to UXB in the amount of $47,701.13. (Ex. 24, Cimoglu Dep. 131:4-14) 77 Construction did not identify which Purchase Order the work identified in 186 was related to except to say the work was allegedly performed at the First Camp. (*Id.*) Nevertheless, UXB paid Invoice 186 in full. (Cimoglu Dep. 133:11-14)

54.    On or about June 15, 2010, 77 Construction issued Invoice 192[28] in the amount of $51,800 for the rental of two cranes. (Ex. 25, Cimoglu Dep. 136:16-20) No Purchase Order is identified in Invoice 192. (Ex. 25) UXB did not pay Invoice 192. (Dugger Dep. 61:2-62:14) The rental of two cranes is consistent with PO-33 and was invoiced and paid in full under Invoice 183. (Cimoglu Dep. 130:23-131:8)

55.    On or about July 8, 2010, 77 Construction issued Invoice 211[29] in the amount of $35,218.05. (Ex. 26, Cimoglu Dep. 140:24-141:6) 77 Construction identifies PO-28 as the purchase order pursuant to which the work identified in Invoice 211 was

---

[26] A true and correct copy of Invoice 183 is attached hereto as **Exhibit 23**.
[27] A true and correct copy of Invoice 186 is attached hereto as **Exhibit 24**.
[28] A true and correct copy of Invoice 192 is attached hereto as **Exhibit 25**.
[29] A true and correct copy of Invoice 211 is attached hereto as **Exhibit 26**.

performed. (Ex. 26) Invoice 211 covers work allegedly performed by 77 Construction at the First Camp after the issuance of the Stop-Work Order and the execution of PO-52. (Ex. 26, Cimoglu Dep. 80:8-81:14; 140:24-141:6) UXB paid Invoice 211 in full. (Cimoglu Dep. 142:14-16.)

56.    On or about July 8, 2010, 77 Construction issued Invoice 212[30] in the amount of $31,710. (Ex. 27, Cimoglu Dep. 145:5-11) 77 Construction identifies PO-52 as the purchase order pursuant to which the work identified in Invoice 212 was performed. (Ex. 27, Cimoglu Dep. 145:22-24; 147:13-18) UXB paid Invoice 212 in full. (Cimoglu Dep. 147:13-18)

57.    On or about July 8, 2010, 77 Construction issued Invoice 214[31] in the amount of $300,000. (Ex. 28, Cimoglu Dep. 151:3-9) 77 Construction identifies PO-73 as the purchase order pursuant to which the work identified in Invoice 214 was performed. (Ex. 28, Cimoglu Dep. 150:3-151:21)   Three hundred thousand dollars constitutes the full amount of PO-73 and was paid in full by UXB.   (Cimoglu Dep. 154:20-22)

58.    On or about July 26, 2010, 77 Construction issued Invoice 234[32] in the amount of $30,892.50. (Ex. 29, Cimoglu Dep. 157:9-16) 77 Construction identifies PO-91 as the purchase order pursuant to which the work identified in Invoice 234 was performed. (*Id.*) UXB paid Invoice 234 in full. (Cimoglu Dep. 160:1-3.)

59.    On or about July 26, 2010, 77 Construction issued Invoice 235[33] in the amount of $85,537. (Ex. 30, Cimoglu Dep. 160:14-161:1.) 77 Construction identifies

---

[30] A true and correct copy of Invoice 212 is attached hereto as **Exhibit 27**.
[31] A true and correct copy of Invoice 214 is attached hereto as **Exhibit 28**.
[32] A true and correct copy of Invoice 234 is attached hereto as **Exhibit 29**.
[33] A true and correct copy of Invoice 235 is attached hereto as **Exhibit 30**.

PO-92 as the purchase order pursuant to which the work identified in Invoice 235 was performed. (*Id.*) UXB did not pay Invoice 235. (Dugger Dep. 61:2-62:14)

60. On or about July 26, 2010, 77 Construction issued Invoice 236[34] in the amount of $117,654. (Ex. 31, Cimoglu Dep. 162:23-163:5) 77 Construction identifies PO-78 as the purchase order pursuant to which the work identified in Invoice 236 was performed. (*Id.*) UXB did not pay Invoice 236. (Dugger Dep. 61:2-62:14)

61. On or about August 22, 2010, 77 Construction issued Invoice 264[35] in the amount of $17,118.68. (Ex. 32, Cimoglu Dep. 165:4-21) 77 Construction does not identify a purchase order pursuant to which the work identified in Invoice 264 was performed but claims the work was performed pursuant to PO-28. (*Id.*) Invoice 264 covers work allegedly performed by 77 Construction at the First Camp after the issuance of the Stop-Work Order and the execution of PO-52. (Cimoglu Dep. 165:4-21.) UXB did not pay Invoice 264. (Dugger Dep. 61:2-62:14.)

62. On or about October 12, 2010, 77 Construction issued Invoice 320[36] in the amount of $3,140.72. (Ex. 33, Cimoglu Dep. 168:4-8) 77 Construction does not identify a purchase order pursuant to which the work identified in Invoice 320 was performed. (Ex. 33) Invoice 320 appears to be related to Diesel Refueling during September of 2010. (Ex. 33, Cimoglu Dep. 168:14-169:16) UXB paid Invoice 320 in full. (Dugger Dep. 61:2-62:14)

63. On or about October 14, 2010, 77 Construction issued Invoice 326[37] in the amount of $117,654. (Ex. 34, Cimoglu Dep. 170:22-171:6) 77 Construction identifies

---

[34] A true and correct copy of Invoice 236 is attached hereto as **Exhibit 31**.
[35] A true and correct copy of Invoice 264 is attached hereto as **Exhibit 32**.
[36] A true and correct copy of Invoice 320 is attached hereto as **Exhibit 33**.
[37] A true and correct copy of Invoice 326 is attached hereto as **Exhibit 34**.

PO-78 as the purchase order pursuant to which the work identified in Invoice 236 was performed. (Ex. 34, Cimoglu Dep. 170:22-171:6) UXB did not pay Invoice 326. (Dugger Dep. 61:2-62:14.)

64. On or about July 26, 2010, 77 Construction issued Invoice 327[38] in the amount of $30,892.50. (Ex. 35, Cimoglu Dep. 179:14-24) 77 Construction identifies PO-91 as the purchase order pursuant to which the work identified in Invoice 327 was performed. (Ex. 35, Cimoglu Dep. 179:14-24) UXB did not pay Invoice 327. (Dugger Dep. 61:2-62:14)

65. On or about July 26, 2010, 77 Construction issued Invoice 328[39] in the amount of $85,537. (Ex. 36, Cimoglu Dep. 174:2-10) 77 Construction identifies PO-92 as the purchase order pursuant to which the work identified in Invoice 235 was performed. (Ex. 36, Cimoglu Dep. 174:2-10) UXB did not pay Invoice 328. (Dugger Dep. 61:2-62:14)

66. On or about October 14, 2010, 77 Construction issued Invoice 329[40] in the amount of $32,342. (Ex. 37, Cimoglu Dep. 176:4-177:14) 77 Construction identifies PO-68 as the purchase order pursuant to which the work identified in Invoice 329 was performed. (Id.) There is no Purchase Order 68 between 77 Construction and UXB. (Dugger Dec. 14) No such Purchase Order exists. (Id.) UXB did not pay Invoice 329. (Dugger Dep. 61:2-62:14)

67. On or about November 22, 2010, 77 Construction issued Invoice 348[41] in the amount of $20,657. (Ex. 38, Cimoglu Dep. 181:24-182:20) 77 Construction

---

[38] A true and correct copy of Invoice 327 is attached hereto as **Exhibit 35**.
[39] A true and correct copy of Invoice 328 is attached hereto as **Exhibit 36**.
[40] A true and correct copy of Invoice 329 is attached hereto as **Exhibit 37**.
[41] A true and correct copy of Invoice 348 is attached hereto as **Exhibit 38**.

identifies PO-92 as the purchase order pursuant to which the work identified in Invoice 348 was performed. (*Id.*) Invoice 348 is for materials that were stolen from the worksite while building a fence around the Russian Motor Pool area. (*Id.*) UXB did not pay Invoice 348. (Dugger Dep. 61:2-62:14)

68.     On or about November 2, 2010, 77 Construction issued Invoice 363[42] in the amount of $31,000. (Ex. 39, Cimoglu Dep. 183:9-19) 77 Construction does not identify a purchase order pursuant to which the work identified in Invoice 363 was performed but claims the work was performed pursuant to Purchase Order 69. (*Id.*) There is no Purchase Order 69 between 77 Construction and UXB. (Dugger Dec. 14, Cimoglu Dep. 184:12-17) Invoice 363 appears to be related to the movement of T-Walls. (Ex. 39) UXB did not pay Invoice 363. (Dugger Dep. 61:2-62:14.)

69.     On or about November 13, 2010, 77 Construction issued Invoice 382[43] in the amount of $2,602. (Ex. 40, Cimoglu Dep. 185:12-186:17) 77 Construction identifies PO-72 as the purchase order pursuant to which the work identified in Invoice 382 was performed. (*Id.*) There is no Purchase Order 72 between 77 Construction and UXB. (Dugger Dec. 14, Cimoglu Dep. 185:12-186:17) UXB did not pay Invoice 382. (Dugger Dep. 61:2-62:14.)

70.     On or about November 22, 2010, 77 Construction issued Invoice 394[44] in the amount of $48,837. (Ex. 41, Cimoglu Dep. 188:2-189:15) 77 Construction identifies PO-76 as the purchase order pursuant to which the work identified in Invoice 394 was performed. (*Id.*) There is no Purchase Order 76 between 77 Construction and UXB.

---

[42] A true and correct copy of Invoice 363 is attached hereto as **Exhibit 39**.
[43] A true and correct copy of Invoice 382 is attached hereto as **Exhibit 40**.
[44] A true and correct copy of Invoice 394 is attached hereto as **Exhibit 41**.

(Dugger Dec. 14) No such Purchase Order exists. (*Id.*) UXB did not pay Invoice 394. (Dugger Dep. 61:2-62:14)

71.     On or about November 22, 2010, 77 Construction issued Invoice 395[45] in the amount of $69,495. (Ex. 42, Cimoglu Dep. 191:2-192:19) 77 Construction initially identifies PO-77 as the purchase order pursuant to which the work identified in Invoice 395 was performed but later submits a revised invoice showing that the work was performed under PO-52. (*Id.*) UXB did not pay Invoice 395. (Dugger Dep. 61:2-62:14)

72.     On or about November 22, 2010, 77 Construction issued Invoice 411[46] in the amount of $8,800. (Ex. 43, Cimoglu Dep. 193:6-194:13) 77 Construction identifies PO-69 as the purchase order pursuant to which the work identified in Invoice 411 was performed. (*Id.*) There is no Purchase Order 69 between 77 Construction and UXB. (Dugger Dec. 14) No such Purchase Order exists. (*Id.*) UXB did not pay Invoice 411. (Dugger Dep. 61:2-62:14.)

73.     On or about December 10, 2010, 77 Construction issued Invoice 434[47] in the amount of $11,582.48. (Ex. 44, Cimoglu Dep. 195:19-197:9) 77 Construction does not identify a purchase order pursuant to which the work identified in Invoice 434 was performed. (*Id.*) Invoice 434 appears to be related to Diesel Refueling during from September through November of 2010. (Ex. 44) UXB paid Invoice 434 in full. This was the last invoice submitted by 77 Construction to UXB. (Cimoglu Dep. 197:10-23)

---

[45] A true and correct copy of Invoice 395 is attached hereto as **Exhibit 42**.
[46] A true and correct copy of Invoice 411 is attached hereto as **Exhibit 43**.
[47] A true and correct copy of Invoice 434 is attached hereto as **Exhibit 44**.

## The Defense Contracting Auditing Agency

74.     All of the Invoices and any payments thereunder are provisional pending final audit by the Defense Contract Auditing Agency ("DCAA").  (Dugger Dec. 11; Dugger Dep. 55:10-16; 58:15-59:13)

75.     All of the Invoices submitted by 77 Construction are subject to audit by the DCAA.  (*Id.*; Reid Dep. 44:24-45:15 Nov. 18, 2013[48])  Therefore, all of the Invoices and any payments thereunder are "provisional" pending audit by the DCAA and final close out.  (Dugger Dec. 11)

76.     As part of the final audit process, the DCAA can disallow questionable costs if the costs are not found to be reasonable, allowable and/or allocable. The DCAA has this authority under both the FAR, 48 CFR 242, *et seq.*, 48 CFR 31.201-1 *et seq.*, 48 CFR 15.407 *et seq.* and the Truth in Negotiations Act ("TINA"), 10 U.S.C. 2603(a) *et seq.*

77.     If costs are disallowed, the U.S. Government can require that the disallowed costs be repaid to the Government.  (*See e.g.* 10 U.S.C. 2603(e) *et seq.*). The Government also has the authority to issue penalties.  (48 CFR 52.242-3, 10 U.S.C. 2603(f))

## UXB Demands Supporting Documentation

78.     On numerous occasions, UXB demanded that 77 Construction provide supporting documentation to support the costs invoiced to UXB. (*See* Letter to 77 Construction dated July 1, 2011,[49] Dugger Dec. 12)

---

[48] A true and correct copy of the relevant portions of Thomas Reid's Deposition Transcript is attached hereto as **Exhibit 45**.
[49] A true and correct copy of some of these communications is attached hereto as **Exhibit 46**.)

79.     UXB repeatedly informed 77 Construction that it needed the supporting cost documentation to close out the contract with the Government, and to be prepared for a DCAA audit. (Ex. 46, Dugger Dec. 12)  UXB also repeatedly informed 77 Construction that these same cost documentation items were required deliverables under the contracts and required for full performance of same. (*Id.*)

80.     Despite these repeated requests, 77 Construction has not provided the requisite supporting documentation of its costs of performance. (Cimoglu Dep. 85:10-86:13, 113:10-114:9, 131:9-14, 133:24-134:10, 148:11-149:20, 151:6-19; Dugger Dec. 12)

81.     As a result of 77 Construction's repeated refusals to provide supporting documentation or submit to a cost audit, UXB withheld all outstanding payments.

**The Litigation**

82.     UXB's withholding of payment for amounts invoiced by 77 Construction, led 77 Construction's principal, Ciliv, and subsequently, 77 Construction to file a lawsuit against UXB alleging, *inter alia*, breach of contract and *quantum meruit* for the unpaid amounts.

83.     During discovery in these lawsuits, it became increasingly clear to UXB that 77 Construction had not retained or simply did not have records substantiating the expenses and costs reflected in its Invoices, and that many of its costs were unsupported.

84.     As a result, UXB grew even more concerned that it would not be able to substantiate its costs during a DCAA audit and that if 77 Construction's lawsuit was successful, it might be required to return monies to the Government that it had already paid to 77 Construction.

85.     As a result, UXB filed a counterclaim against 77 Construction for breach of contract resulting from 77 Construction's failure to maintain and provide supporting documentation for its costs and expenses and/or submit to a cost audit.

## The False Claims

86.     Discovery in the litigation progressed, and during the deposition of 77 Construction's corporate designee, Muhittin Cimoglu, he revealed that 77 Construction's overhead costs were not calculated using actual overhead and costs figures but were set at a flat rate between 5–15% for all 77 Construction contracts, depending upon the perceived risk of the project and market factors. (Cimoglu Dep. 87:05–91:11.)

87.     UXB quickly realized that this overhead rate was inconsistent with 77 Construction's 2010 Audited Financial Statement, wherein it listed operational expenses of approximately 2.6% of its direct expenses. Thus, 77 Construction had significantly inflated the overhead costs it listed on its Invoices and estimates. Despite numerous requests for additional information supporting the alleged overhead rates, 77 Construction did not produce records supporting the build-up of this overhead rate or other meaningful supporting documentation.

88.     Upon information and belief, 77 Construction and the other Defendants routinely inflated the overhead costs for all Government contracts and subcontracts it performed in both Afghanistan and Iraq over a period of many years.[50] Ciliv admitted and acknowledged this to UXB in a conversation held in Blacksburg, Virginia on or about November 25, 2013.

---

[50] During the time 77 Construction was subcontracting for UXB at Bagram, it was also contracting with, *inter alia*, CH2M Hill, USIDC, Bagram Regional Contracting Center, Kabul Group, and Piril Insaat.

89.     77 Construction knew that the costs and expenses reflected in its Invoices were not true and accurate. 77 Construction also knew that UXB would submit these claims to the Government for payment.

90.     After reviewing the deposition testimony and in light of the November 25, 2013 admissions by Ciliv and Cimoglu, UXB realized that it had unknowingly, and based on the false representations and fraud of 77 Construction, submitted these false and inflated Invoices to the Government for provisional payment and that many of them had already been paid.

91.     Accordingly, UXB realized it was an unknowing intermediary and could be liable for 77 Construction's false claims unless it took action.

92.     The inflated overhead costs, alone, that 77 Construction charged UXB amounted to approximately five hundred and sixty thousand dollars ($560,000).

### UXB's Corrective Actions

93.     Soon after UXB realized that 77 Construction's costs were falsely inflated, it contacted the contracting officer on the Prime Contract and the United States Army Corps of Engineers and requested the guidance and instruction on how to handle the 77 Construction billings in light of this information.

94.     On January 6, 2014, UXB issued a disallowance letter to 77 Construction, noting the foregoing issues with 77 Construction's billings and invoices.[51] UXB also provided a copy of this disallowance letter to the United States Army Corps of Engineers and to the United States Attorney for the Western District of Virginia.

---

[51] A true and correct copy of UXB's January 6, 2014 letter to 77 Construction is attached hereto as **Exhibit 47**.

95.     On February 6, 2014, UXB and 77 Construction met for a Court ordered Settlement Conference. As a result, the parties reached an agreement regarding certain matters at issue in the litigation, which was memorialized on the record by the presiding magistrate judge. On March 11, 2014, UXB notified the United States Army Corp of Engineers and its legal counsel of these developments by letter. In the March 11, 2014 letter, UXB also provided its assessment that it could not certify 77 Construction's costs and, as a result, could not submit a final certification of costs under the Prime Contract while the litigation between UXB and 77 Construction was still pending. In the letter, UXB requested guidance from the United States Army Corp of Engineers regarding any amounts that must be refunded and costs adjustments under the Prime Contract.[52]

96.     UXB then initiated the instant action, on behalf of the Government, in order to recover the amounts already paid to 77 Construction; prevent further payment of 77 Construction's false claims by UXB, as well as the numerous other government contractors for whom 77 Construction has performed services; and to notify the U.S. Government that, upon information and belief, 77 Construction has received and is continuing to receive payments from its submission of false claims that potentially totals in the tens of millions of dollars each year.

## COUNT I: FALSE CLAIMS FOR PAYMENT

97.     *Qui Tam* Plaintiff UXB hereby incorporates paragraphs 1–96.

98.     77 Construction submitted its Invoices in response to the Purchase Orders issued by UXB during the time period of 2010 through 2013.

---

[52] A true and correct copy of UXB's March 11, 2014 to the United States Army Corp of Engineers is attached hereto as **Exhibit 48.**

99.     Each Invoice certified that the goods and services delivered conformed to the terms of the Purchase Orders, as well as that the charges were accurate.

100.     Many of the Purchase Orders were sole source contracts and/or were for amounts greater than $700,000.

101.     As such, these contracts are subject to the TINA.

102.     Under TINA, 77 Construction had an affirmative duty to ensure that the costs in its invoices and estimates were complete and accurate.  Under many of the contracts, 77 Construction also expressly agreed to only bill for time and materials actually expended in performance of the work.

103.     However, the costs and expenses contained in the Invoices identified above and submitted in response to the Purchase Orders contained false and inflated charges for overhead expenses and costs.

104.     Upon information and belief, some or all of the Defendants submitted similar invoices to a variety of Government contractors while working in Afghanistan, including but not limited to: CH2M Hill, USIDC, Bagram Regional Contracting Center, Kabul Group, and Piril Insaat.  Based on the admissions of Ciliv and 77 Construction, these billings contain inflated overhead charges.

105.     Moreover, upon information and belief, Defendants' practice of submitting false invoices began in Iraq, and would include its billings for work performed there during and following the Iraq war and reconstruction.  Based on the comments of Ciliv and 77 Construction, these billings also contain inflated overhead charges.

106.     Further, Defendants' practice of inflating its invoices with false expenses and overhead charges has continued and will likely continue until Defendants are stopped by the Government.

107.    UXB and, upon information and belief, numerous other government contractors, received these inflated invoices and then, not knowing the claims were fraudulent, submitted the invoices to the Government for payment.

108.    77 Construction knew that UXB, as well as the other government contractors whom 77 Construction contracted with, would present these inflated invoices to the Government for payment. The same is true of the other Defendants, upon information and belief.

109.    Therefore, Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States, false or fraudulent claims for payment or approval.

### COUNT II – FALSE STATEMENTS

110.    *Qui Tam* Plaintiff UXB hereby incorporates paragraphs 1–109.

111.    77 Construction knowingly made, used, or caused to be made or used, false records and/or statements to get the false or fraudulent claims paid or approved.

112.    For example, 77 Construction submitted Construction Cost Estimate Proposals to UXB for Purchase Orders 28 and 52. The overhead expenses and costs contained in these estimates were false.

113.    Upon information and belief, 77 Construction prepared and submitted numerous other Construction Cost Estimate Proposals to the other government contractors with whom it contracted in Iraq and Afghanistan.

114.    Therefore, 77 Construction knowingly made, used, or caused to be made or used, false records or statements in order to get false or fraudulent claims paid or approved by the Government.

115.    The remaining defendants, upon information and belief, also knowingly made, used, or caused to be made or used, false records or statements in order to get false or fraudulent claims paid or approved by the Government.

## PRAYER FOR RELIEF

WHEREFORE, for each of the claims, the *Qui Tam* Plaintiff requests the following relief from the Defendants:

A. Three times the amount of damages that the Government sustained because of the acts of the Defendant;

B. A civil penalty of $11,000 for each violation;

C. An award to the *Qui Tam* Plaintiff UXB for collecting the civil penalties and damages totaling no less than twenty percent (20%) of the total monetary relief recovered;

D. An award of the reasonable expenses necessarily incurred by *Qui Tam* Plaintiff UXB in bringing this action;

E. An award of the *Qui Tam* Plaintiff UXB's reasonable attorneys' fees and costs;

F. Interest; and

G. Such further relief as the Court deems just.

## JURY REQUEST

*Qui Tam* Plaintiff UXB requests a jury for all issues that may be tried by a jury.

Respectfully submitted,

UNITED STATES OF AMERICA, *ex rel.,*
UXB INTERNATIONAL, INC.,

**By:    s/Eric D. Chapman**
James K. Cowan, Jr. (VSB #37163)
Brian S. Wheeler (VSB# 74248)
Eric D. Chapman (VSB# 86409)
CowanPerry PC
202 South Main Street, Suite 202
P.O. Box 159
Blacksburg, Virginia 24060
Telephone: (540) 443-2850
Facsimile: (888) 755-1450
jcowan@cowanperry.com
bwheeler@cowanperry.com
echapman@cowanperry.com

*Counsel for UXB International, Inc.*